1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10  ANSAR EL MUHAMMAD,
    also known as CHEVAL WRIGHT,

11

12              Petitioner,              No. 2:04-cv-1856 JAM JFM (HC)

13        vs.

14  MATTHEW CATE, et al.,[1]

15              Respondents.             FINDINGS AND RECOMMENDATIONS

16  _____/

17              Petitioner is a state prisoner proceeding through counsel with an application for a

18  writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2001 conviction on

19  charges of first degree felony murder, attempted robbery, and second degree robbery.

20  Petitioner's conviction followed a retrial on charges reinstated after petitioner's prior conviction

21  /////

22  /////

23  _____

24      [1] By order filed October 11, 2007, James Tilton, then Director of the California
    Department of Corrections and Rehabilitation (CDCR), was substituted in as a respondent in
    place of former Director Jeanne Woodford, and Derral G. Adams, Warden of Corcoran State
25  Prison, was substituted in as a respondent in place of former Warden Eddie Ylst.  Good cause
    appearing, the present Secretary of the CDCR, Matthew Cate, is hereby substituted in as a
26  respondent in place of James Tilton.

1  arising from the same incident was set aside by issuance of a federal writ of habeas corpus.[2]   At

2  the first trial, petitioner was convicted on charges of first degree murder, attempted murder,

3  attempted robbery, and robbery.  See Clerk's Transcript on Appeal (CT) at 27 (Findings and

4  Recommendations filed Oct. 27, 2000.)  All of the convictions were accompanied by findings

5  that petitioner personally used a firearm in the commission of the offenses, and the jury also

6  found that petitioner committed the murder during the course of a robbery or attempted robbery.

7  Id.  Petitioner's prior conviction was set aside on the ground that his right to due process was

8  violated by admission of an apology letter written by petitioner found to be the "tainted fruit" of a

9  coerced confession.  Id. at 23-25, 42-55.  On retrial, the jury rejected the allegations of personal

10 use of a firearm, "instead sustaining lesser-included allegations that a principal was armed during

11 the crimes."  People v. Cheval Shannon Wright, No. C039121 (Dec. 11, 2002), slip op. at 2.[3]

12 The second jury found, as did the first jury, that the murder occurred during the commission of a

13 robbery.  Id.  This action is proceeding on five of the six claims raised in petitioner's first

14 amended petition, filed February 14, 2005.[4]

15                                                   FACTS[5]

16                          **A.  Undisputed Facts and Objective Witnesses**

17                  The [petitioner] drove a Hyundai to the home of acquaintances,
                   where he joined a group drinking alcohol and smoking marijuana.
18                 Five of the partyers, including the [petitioner], departed in the

19  _____

20      [2]  The writ of habeas corpus was issued in an action filed in this court, Case No. 2:98-cv-
    1173-FCD-JFM (HC).

21      [3]  A copy of this decision is attached to the petition for review lodged in this record by
22  respondents on March 30, 2005 as Item No. 1.

23      [4]  Petitioner's third claim for relief is withdrawn in the traverse, as are his claims of
    ineffective assistance of trial and appellate counsel based on the failure of trial counsel to request
    an accomplice instruction.  See Traverse, filed January 16, 2007, at 44, 63.
24

25      [5]  The facts are taken from the opinion of the California Court of Appeal for the Third
    Appellate District in People v. Cheval Shannon Wright, No. C039121 (Dec. 11, 2002), a copy of
    which is attached to the petition for review lodged in this record by respondents on March 30,
26  2005 as Item No. 1.

Hyundai to buy more alcohol.[6]  The [petitioner] was too inebriated, so he asked someone else to drive.

The two victims were among the four occupants of an open convertible that was dropping off one of the passengers in the North Highlands area.  As the convertible neared the passenger's home, it passed the Hyundai, which was heading in the opposite direction.  The [petitioner] told the Hyundai driver to make a U-turn.  As the convertible began its own U-turn to drop off the passenger on her side of the street, the Hyundai stopped in front of it (though not blocking it).

According to a bystander who witnesses the crimes, a man got out of the Hyundai and approached the convertible.  He yelled at the victims, then pointed a gun at them.  A second man got out of the Hyundai and attempted to restrain the first.  The first man (who was darker-complected) broke free and fired two or three shots.  The bystander identified the [petitioner] as the second man, based primarily on his lighter complexion and physical appearance in comparison with the codefendant.  In 1993, he had not been able to identify either the codefendant or the [petitioner] in photo lineups.

A deputy assigned to the jail in October 1994 testified that he had conducted a random search of the codefendant's mail.  He found an outgoing letter bearing the codefendant's return address and signature in which was written, "Just 'cause I got out of the car with the [gun], that don't prove shit."

**B.  Victim Accounts**

The convertible driver had died in an automobile accident by the time of the retrial.  The prosecutor read from transcripts of his testimony in the first trial.  The witness had described two men simultaneously getting out of the Hyundai.  The first, who was dark-complected, walked up to the convertible and asked where they lived.  He was holding a gun.  The other man hung back.  Both of them wore colored rags at their waists.  The armed man then demanded money.  The driver was in the process of offering the $10 or so in cash in his pocket when he heard gunfire.  He looked behind him; the murder victim was grimacing.  The second man, who had a lighter complexion, grabbed the first man.  The driver grabbed at the gun; as the barrel began to slip out of his hand, he pushed it away and floored the accelerator.  The first man fired a shot in the direction of the convertible as it drove off.  The driver discovered that he had a bullet wound in his stomach.

---

[6] Although one of the partyers testified there was talk of selling "fake dope" to get drinking money (which they apparently had done on occasion), the remainder of the testifying partyers denied any plan to do so or to rob anyone for purposes of obtaining drinking money.

The convertible driver was an unwilling witness, because he was facing the start of his own prison term and did not want to be known as a snitch through his identification of the two men. Before his testimony at the preliminary hearing, he found himself in the same holding cell as the [petitioner], with whom he spoke.[7] There were no charges pending against the codefendant at that time. While he was willing to adhere to his identification at the preliminary hearing of the [petitioner] as the person who attempted to restrain the shooter, he would not identify the codefendant as the shooter even though he had picked his photo in a lineup a few weeks after the shooting. However, the driver had admitted to both defense and prosecution investigators in interviews before and after the preliminary hearing that the codefendant was the shooter.

The surviving male convertible passenger also testified the codefendant had approached the car, gun in hand, and questioned them before demanding money. He saw the codefendant shoot at the murder victim and the convertible driver. Someone then grabbed the codefendant, struggling for the gun. When confronted with his testimony at the preliminary hearing that someone had grabbed the gun from the first man, he corrected his recollection. He believed the codefendant was the second person to approach the car, at which point he took the gun from the first person and immediately fired at them. Whatever his confusion, he was still sure that the codefendant was the shooter. He had not been able to identify him in a photo lineup, but the witness attributed his difficulty to the poor quality of the picture of the codefendant.

The female convertible passenger testified the codefendant approached the car, and aggressively questioned them about their places of residence. She had seen him around the neighborhood, but did not know him by name. The [petitioner] then approached the car. He was wearing a colored bandana and had a gun in his hand. She was not sure which one of them demanded money. She thought the murder victim pulled a dollar out of his pocket.[8] She did not see who fired shots, and could not recall if the codefendant had the gun in his possession at any time (although she acknowledged testifying in the first trial that he held it at some point). In interviews with the police shortly after the shooting, the female convertible passenger had said three men got out of the convertible (one of whom remained near the Hyundai), but she could not now recall the interviews. She could not remember an interview during a photo lineup (in which she had identified the codefendant), when she asserted the codefendant held the gun at

---

[7] During his appearance as a witness in the previous trial, he was in the same holding area with the [petitioner] and codefendant on at least 10 occasions.

[8] A detective found a $1 bill on the floor in the back seat of the Oldsmobile.

least some of the time but the other man had done all the talking; again, she was not sure which one had fired it.[9]  She had not been able to identify the [petitioner] in photo lineups.  At the preliminary hearing, she identified the [petitioner] as the man who held the gun and interrogated the convertible's occupants.  However, at the first trial, she acknowledged the codefendant also had the gun at some point; she was not sure who fired it, but believed it was the person holding it when he got out of the other car.

## C.  Hyundai Occupant Accounts

The three occupants of the Hyundai (other than the [petitioner] and the codefendant) were close friends and members of the same gang faction as the codefendant.  The [petitioner], on the other hand, was from a different neighborhood faction of the gang.  They had only recently met him, and did not owe any particular loyalty to him.

The female Hyundai passenger testified that she did not see either man with a gun when the [petitioner] and codefendant got out of the car.  She could not hear what they said to the convertible occupants.  When she got out of the car after hearing a gunshot, she saw only the [petitioner] with the gun in his hand.

The Hyundai driver claimed all of his passengers got out of the car.  He could not hear what anyone was saying, except for the demand for money; he could not tell who issued that command.  He could not tell who fired the gun – he only saw it for the first time later in the back yard of the party house.

The other male Hyundai passenger heard the [petitioner] demand money from the people in the convertible, then heard a shot.  He got out of the Hyundai and saw the [petitioner] fire a second shot at the convertible driver, after which he helped the codefendant to restrain the [petitioner] and pull him back to the Hyundai.[10]  This was the first he had seen of the gun that day.  He admitted that his trial testimony was less favorable to the [petitioner] than his testimony at the preliminary hearing, because the [petitioner] was now trying to blame the codefendant for the crimes.

/////

---

[9]  She did recall this interview at the previous trial.

[10]  The subject of an arrest warrant for a number of offenses involving firearms, this witness apparently fled the jurisdiction before the second trial.  The prosecution read his testimony from the first trial into the record.

**D. Aftermath**

Everyone in the Hyundai returned to the house where they had been partying. They parked the car around the corner. Everyone was agitated and talking about the shooting. The [petitioner] asked for a change of clothes. Somebody attributed the shooting to the [petitioner]; though present, he remained silent and did not deny it.[11] Pulling money out of his pocket, the [petitioner] expressed his disbelief that "all [he] got was ten dollars from it."

The [petitioner] had borrowed the Hyundai from his girlfriend's roommate. Shortly after the shootings, the [petitioner] phoned his girlfriend and said she should report that the car was stolen. He would not elaborate. Later that night, the [petitioner] met with his girlfriend around the corner from her apartment and returned the keys. He then moved to Fairfield with his girlfriend, where he cut his hair and attempted to find a job.

Hearing of the [petitioner]'s August 1993 arrest, the murder victim's widow came to see him in jail accompanied by her teenage niece. She identified herself and asked why he had killed her husband. The [petitioner] said he was sorry for what happened, and he would trade his life for her husband's if he could. She claimed the visit lasted 10 to 15 minutes. The widow did not mention this conversation at the first trial, nor did she tell the present prosecutor about it at first until she collected her thoughts. She could not explain the omission, other than having been "emotionally stressed out . . . and I just didn't think about telling anybody." She also thought that perhaps it was improper to have visited him.

The jail records show a visit from the widow, accompanied by a minor, on September 2, 1993, at 1:06 p.m., and an in *and* out time for the [petitioner] of 1:12 p.m. One cannot necessarily determine from these records either the length of a visit, or if an inmate refused to speak with a visitor. There was nothing otherwise to corroborate her conversation with the [petitioner]. The widow admitted she had a 1994 felony conviction for being an accessory after the fact to an assault.

People v. Wright, slip op. at 2-9.

/////

/////

/////

_____

[11] The witness testifying to this adoptive admission had not mentioned it at the earlier trial.

ANALYSIS

I. <u>Standards for a Writ of Habeas Corpus</u>

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different result.  <u>Early v. Packer</u>, 537 U.S. 3, 7 (2002) (<u>citing</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 405-406 (2000)).

Under the  "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  <u>Williams</u>, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  <u>Id.</u> at 412; <u>see also</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment.  <u>Avila v. Galaza</u>, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

7

1   reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

2   habeas court independently reviews the record to determine whether habeas corpus relief is

3   available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

4   II.  Petitioner's Claims

5           A.  Testimony of Victim's Wife

6                    Petitioner's first claim is that his rights to due process and a fair trial were

7   violated when the victim's wife testified to admissions that petitioner allegedly made to her.

8   Petitioner contends that those alleged admissions were "tainted fruits" of his coerced confession

9   and, therefore, that his second conviction should be set aside.  Petitioner's second claim is that

10  his "rights to cross-examine and confront witnesses and to present a defense" were violated when

11  he was prohibited from cross-examining the victim's wife "regarding her prior felonious

12  conduct."  First Amended Petition, filed February 14, 2005, at 10.

13                   The last reasoned rejection of these claims is the decision of the state court of

14  appeal on petitioner's direct appeal, which rejected the claims as follows:

15           In the unpublished portion of *Wright*, we concluded there was
             substantial evidence supporting the trial court's conclusion that the
16           [petitioner]'s letter of apology to the murder victim's family was
             not the product of a preceding coercive police interview but of the
17           [petitioner]'s deference to his father, who had pressured him to
             write on.  (*People v. Wright* (Dec. 13, 1996, C020395 [nonpub.
18           portion of opn.].)  The federal court decided this question of
             causation de novo.  The court concluded that because the letter
19           incorporated terms that the detective had suggested during the
             coercive interview, the letter was a product of the tainted interview.
20           (*Muhammad v. Terhune* (E.D. Cal. Dec. 7, 2000, No. Civ. S-98-
             1173 FCD JFM P).)[12]
21
             Before trial, the [petitioner] moved to exclude the testimony of
22           the murder victim's widow on the ground that it came within the
             lingering coercive effects of the police interrogation almost two
23           weeks earlier.  The court denied the motion, finding that any
             effects of the interrogation were sufficiently attenuated by the time
24  /////

25  _____

26          [12]  The [petitioner] has apparently changed his name in prison.  To avoid confusion, we
    adhere to his birth name.

of the widow's conversation.  The [petitioner] renewed his objection before she testified.

The prosecutor had sought to exclude evidence of the widow's 1994 conviction.  In opposing the motion, the [petitioner] also sought to introduce the facts underlying the conviction.  The court ruled the conviction constituted an offense of moral turpitude and thus was admissible to impeach the widow's credibility.  The court did not think the facts underlying the offense were admissible, but noted it would exercise its discretion to exclude them under Evidence Code section 352 in any event because it would require yet another witness if the widow were to contest them in any fashion.

On appeal, the [petitioner] challenges both of these rulings.  We will not analyze the merits of the rulings, because even if erroneous, they are manifestly harmless.

As the prosecutor conceded in his closing argument, "it is not an absolute admission.  It is not a straight something . . . that resolves it for me.  It was a little squishy in that aspect.  [¶]  . . . He didn't exactly say I killed your husband . . . ."  Rather, "What he didn't say was hey, I didn't kill your husband. . . .  Wouldn't that be the nature response [?]"  The [petitioner]'s contrition could be consistent with his innocence of any crime, because he could simply have been remorseful for starting an interaction that escalated beyond his expectations to a death.

The power of this equivocal evidence was further weakened because there were significant issues of credibility.  The witness failed to disclose this information until her convenient recollection shortly before the retrial, it lacked corroboration (to the point where the jail records could not show the [petitioner] had even agreed to talk to her), and the widow had a felony conviction.

Not only was this weak and compromised evidence, but the jury in fact resolved the sole issue on which it was probative in favor of the [petitioner] -- the identity of the shooter.  It had no bearing whatsoever on the only other controverted issue, his intent to participate in a robbery of the occupants of the convertible.  Therefore, even if the court erred in admitting the widow's testimony and excluding the additional impeachment of the facts underlying the 1994 conviction, we are convinced of its harmlessness beyond a reasonable doubt.

People v. Wright, slip op. at 10-12.

/////

/////

1.  <u>Victim's Wife's Testimony Regarding Petitioner's Statement to Her</u>

Petitioner's first claim arises from the following testimony offered by the victim's wife at trial:

> Q      (By Mr. Johnson)  What, if anything – what, if anything, did you say to Mr. Wright after that?
>
> A      I asked him why did he kill my husband, what did my husband do to him.
>
> Q      And what did he say?
> A      He told me that he is sorry for what happened, and if he could trade his life for my husband's life, he would.
>
> Q      And do you remember the exact words he used Ms. Brown?
>
> A      He used those words, if he could trade his life for my husband's life, he would.
>
> Q      Did he say he was sorry he did it?
>
> A      He said he was sorry for what happened.

Reporter's Transcript on Appeal (RT) at 1147.  On cross-examination, the following exchange took place between defense counsel and the witness:

> Q      Okay.  But he actually didn't say I did it, he said I'm sorry what happened; isn't that right, that's what you just told us?
>
> A      To my recollection, yes.

<u>Id</u>. at 1149-50.

The facts and legal standards relevant to this claim were set forth in the court's October 27, 2000 Findings and Recommendations in Case No. 2:98-cv-1173-FCD-JFM (HC). <u>See</u> CT at 28-34, 42-55.  Any error in admitting the victim's wife's testimony is harmless unless the testimony "had a substantial and injurious impact on the verdict."  <u>Taylor v. Maddox</u>, 366 F.3d 993, 1016 (9th Cir. 2004) (citing <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637-39 (1993).

As this court found in the October 2000 findings and recommendations, the apology letter offered into evidence at petitioner's first trial contained three statements that implied that petitioner was the gunman and that were the product of petitioner's coerced

1    confession:

2              1) "[M]y intentions were not to harm your son; 2) "I know you
             could probably care less whether it was intention or not, but for the
3              record I was not even looking at Kevin Brown when the gun went
             off; and 3) "I had no intention to rob or shoot your son. . . ."
4

5    CT at 44.  In contrast, the statement attributed to petitioner in Ms. Brown's testimony was that, in

6    response to a question about why he killed her husband, petitioner replied that he "was sorry for

7    what happened."  Ms. Brown specifically testified that petitioner did not say that he "was sorry

8    he did it," but that he was "sorry for what happened."  These statements are far more general

9    statements of remorse than the statements in the apology letter and in no way implicated

10   petitioner as the shooter.  Indeed, as the state court of appeal noted and petitioner acknowledges,

11   the jury at his second trial found that petitioner was not the shooter.  See People v. Wright, slip

12   op. at 12; First Amended Petition at 9.  Thus, in contrast to petitioner's first trial, admission of

13   Ms. Brown's testimony as given at the second trial did not have a substantial and injurious effect

14   on the jury's verdict.  The state court's rejection of this claim was neither contrary to, nor an

15   unreasonable application of clearly established federal law.  This claim should be denied.

16                    2.  Impeachment Evidence Regarding Victim's Wife

17              Petitioner's second claim arises from the trial court's decision not to permit

18   petitioner to impeach Ms. Brown through evidence of facts underlying her prior felony

19   conviction.  As noted above, the last reasoned state court rejection of this claim was the decision

20   of the state court of appeal on petitioner's direct appeal, which rejected the claim on the ground

21   that the trial court's decision, "even if erroneous, . . . [was] manifestly harmless."  People v.

22   Wright, slip op. at 11.

23              Constitutional errors arising from infringement of rights protected by the

24   confrontation clause and to present a defense are subject to harmless error analysis.  See Slovik v.

25   Yates, 556 F.3d 747, 755 (9th Cir. 2009) (Confrontation Clause error); DePetris v. Kuykendall,

26   239 F.3d 1057 (9th Cir. 2001) (right to present a defense).  Under this analysis, "[h]abeas relief is

1    warranted only if [an] error had a 'substantial and injurious effect or influence in determining the

2    jury's verdict.'" Depetris at 1061 (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

3            After review of the record, this court finds that any error in the trial court's

4    decision to exclude evidence of facts underlying Ms. Brown's prior felony conviction was

5    harmless. The state court's rejection of this claim was neither contrary to nor an unreasonable

6    application of relevant principles of clearly established federal law. This claim should be denied.

7            B. Prosecutorial Misconduct

8            Petitioner's fourth claim for relief is that his rights to due process and a fair trial

9    were violated by "an extensive pattern of" misconduct in the prosecutor's closing arguments to

10   the jury.[13] Petitioner contends that "[t]he prosecutor's remarks . . . ran the gamut of forms of

11   recognized misconduct, including personal attacks on the integrity of counsel and the defense

12   investigator ([citation omitted]); vouching for his own evidence and case ([citation omitted]);

13   improper use of 'propensity' evidence that had purportedly been admitted for more limited use

14   [(citation omitted]); outright misstatements of the law, and so on. . . . Taken individually, but

15   particularly taken as a whole, those remarks" violated petitioner's rights to due process and a fair

16   trial. First Amended Petition, at 15.

17   _____

18   [13] All of the allegations of prosecutorial misconduct raised in the first amended petition
     were raised by petitioner on direct appeal. See First Amended Petition at 13-15; Lodged Item
19   No. 9 at 62-69. The state court of appeal declined to address two of petitioner's allegations of
     misconduct on the ground that his trial counsel failed to object to the statements. See People v.
20   Wright, slip op. at 19 n.12. Respondents contend the challenge to these two comments,
     identified as ## 7 and 8 in the first amended petition, is therefore procedurally barred. The
21   United States Court of Appeals for the Ninth Circuit has held that failure to comply with
     California's contemporaneous objection rule can result in a procedural bar to federal court
22   consideration of a prosecutorial misconduct claim raised in a habeas corpus petition. See Rich v.
     Calderon, 187 F.3d 1064, 1069-70 (9th Cir. 1999). Petitioner is entitled to relief from a
23   procedural default if he can demonstrate (1) cause for the default and actual prejudice resulting
     from the alleged violation of federal law, or (2) a fundamental miscarriage of justice. Harris v.
24   Reed, 489 U.S. 255, 262 (citing Murray v. Carrier, 477 U.S. 478, 485, 495 (1986)). While the
     standard for relief from a procedural default and the standard for relief on the merits of a claim of
25   prosecutorial misconduct are not identical, both require a showing of fundamental unfairness.
     After review of the record herein, this court finds that, whether taken individually or as part of
26   the whole, the two comments did not "'so infect[] the trial with unfairness as to make the
     resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986)
     (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974).

1    The last reasoned rejection of this claim is the decision of the state court of appeal

2  on petitioner's direct appeal, which rejected the claim as follows:

3         Deceptive or reprehensible methods of prosecutorial argument
      constituted misconduct under state law, to which we apply the
4     familiar test for prejudice – whether its absence would make a
      more favorable outcome for the defendant reasonably likely.
5     (*People v. Morales* (2001) 25 Cal.4th 34, 44 (*Morales*).)  If the
      misconduct is pervasive enough to infect the trial with unfairness,
6     it violates a defendant's right to due process and must be harmless
      beyond a reasonable doubt.  (*Ibid.*)  In analyzing a prosecutor's
7     argument, we must discern whether it is likely that a reasonable
      juror would construe it in an objectionable way.  (*Ibid.*)

8
         The [petitioner] contends the prosecutor committed prejudicial
9     misconduct during closing argument.  While his contention takes
      the form of a narrative criticism of the 70-odd pages of the
10    argument, his general focus is on the prosecutor's communication
      of his personal beliefs, and references to facts dehors the record.[14]

11
         Unlike the [petitioner], we do not find any overarching pattern
12    of misconduct that infected the trial with unfairness.  We thus will
      address individually the claimed instances of misconduct to which
13    he objected in the trial court.[15]

14                                    *A*

15       In the course of criticizing the misrecollections of the bystander
      witness, the prosecutor suggested the bystander's certitude that
16    [petitioner] was not the shooter had been colored as a result of an
      interview with the defense investigator.  He then alluded to the
17    defense investigator turning off his tape recorder during the
      interview with the witness.  Defense counsel objected, noting the
18    prosecutor was conflating the bystander interview with the
      interview with the convertible driver.  The court admonished the
19    jury that the factual or legal representations of counsel were not
      binding on it.  The prosecutor then acknowledged his error.

20

21       [14] Other species of misconduct accrete over the course of his analysis.  While we
22  discourage briefs that structure their arguments in this fashion (*Opdyk v. California Horse
    Racing Bd.* (1995) 34 Cal.App.4th 1825, 1830, fn. 4), we nonetheless will address the additional
23  claims.

24       [15] A failure to object ordinarily precludes appellate review (*Morales, supra*, 25
    Cal.App.4th at pp. 43-44), except under circumstances of particularly egregious misconduct not
25  present here (*People v. Green* (1980) 27 Cal.3d 1, 34).  Moreover, the failure to object ordinarily
    will not establish ineffective assistance of trial counsel absent egregious circumstances not
26  present here.  (*People v. Catlin* (2001) 26 Cal.4th 81, 165; *People v. Frierson* (1991) 53 Cal.3d
    730, 749.)  We thus do not include instances of alleged misconduct to which the defendant did
    not object.

The [petitioner] is correct that the prosecutor misstated the evidence of the defense investigator stopping his tape recorder during an interview.  However, the prosecutor's acknowledgment of his error and the court's admonition cured any misconduct.

**B**

Noting the inclusion of an instruction on the elements of manslaughter, the prosecutor suggested it was superfluous if the killing occurred in the course of a robbery.  "This is a robbery, okay?  I will tell you today, I will tell you tomorrow and the next day after that, this is a robbery.  I am convinced as you sit there now that, you know, this is a robbery."  Defense counsel objected "as to the statement I am convinced."  Making an apology for his choice of words, the prosecutor rephrase it as, "The evidence is beyond doubt that this was a robbery, okay?"

Suggesting that the convertible driver was mistaken about never losing sight of the armed assailant, the prosecutor said, "I think the gun was passed.  Look at the back of that car."  Defense counsel again objected to the use of the first person.  The prosecutor again apologized, continuing, "The evidence shows the gun was passed."

During a recess, defense counsel objected that these two instances suggested extrajudicial evidence of guilt and the prosecutor's personal beliefs.  The court did not find these prejudicial.  When the prosecutor resumed after the recess, he told the jury, "something [defense counsel] objected to that I did when I was talking to you guys earlier this morning, which is fair, is that I can't say this [while] saying I.  When I'm arguing to you, I'm talking about what the evidence shows.  I think I said one time I believe.  I'm not personally vouching and you have got to remember that argument is argument.  That is what we believe the facts showed, all right?  [¶]  And lawyers will oftentimes be a little sketchy, a little flexible with words, and so, when I'm argu[ing] to you today, this is what we believe the evidence has shown.  This is what we think has been presented to you."

To the extent the prosecutor communicated a personal belief, he corrected himself on both occasions, and then (at the court's request) emphasized to the jury that his argument should not be interpreted as communicating a personal belief but merely an interpretation of the evidence.  This was sufficient to cure any misconduct.  We do not find a juror could reasonably have interpreted his remarks as suggesting there was extrajudicial evidence of guilt.

. . . .

/////

**D**

In talking about the testimony of gang behavior and the [petitioner]'s possible membership, the prosecutor suggested a pack mentality was present.  "Why does it take five people to pile into a car [to go get liquor]?  Because when something goes down you always have numbers.  And that is aiding and abetting.  And when you are in a gang, you are motivated to do this because . . . that's what they do.  [¶]  Okay.  Understand something.  The Judge instructed you on gangs and he told you there was some gang evidence about whether he is a [member] or not.  And he told you specifically at that time you are not to say. . .  [i]f he's a [gang member], he is guilty.  What the Judge told you and what you are going to learn again is this:  That gives a motive.  Just because he is a [gang member] doesn't mean you convict him, he is a bad person.  But it gives him motive, right?  [¶]  Football teams play football.  Gangsters commit crimes.  That is what they are doing out there. . . .  And we had asked [the detective] what would a gangster say as to why they carried a weapon, and he said . . . they'd say . . . for protection. . . .  What did [the witness] say, well that gun was just for protection.  They have a certain mental state that is pervasive.  They are committing crimes and they are criminals."  Defense counsel objected.  The trial court overruled the objection.[Footnote omitted]

We do not find any misconduct in the tenor of this part of closing argument.  The prosecutor properly argued that his gang membership motivated the [petitioner] to select this group of random strangers to harass and rob, because this is a gang custom.  At the same time, the prosecutor reminded the jury it could not convict the [petitioner] merely because he was a gang member.  This does not exceed the bounds of the limited purpose of the gang evidence.

**E**

The prosecutor then contended the jury should look at the totality of the evidence and not place too much emphasis on the credibility or inconsistency of any single witness.  "It is not about picking single witnesses and tearing them up, because you know what, lawyers can tear people up.  It is a fact.  This is what we are paid to do, folks.  He is a litigator, that man sitting right there."  The court sustained defense counsel's objection.  The prosecutor, undaunted, continued.  "Some people, because of their education and background, are able to push people around on a witness stand because some people are . . . less," at which point the trial court sustained its own objection "in terms of characterization, pushing people around."

In progressing from a general allusion to a litigator's ability to confuse a witness to a specific reference to defense counsel, the prosecutor may have crossed the line into misconduct.  However,

15

the trial court sustained objections to this vein of argument, communicating sufficient disapproval to cure any adverse suggestion.  That defense counsel did not ask for further admonition is sufficient indication that he was satisfied, and precludes any claim of ineffective assistance on direct appeal for the failure to request additional reproof.

**F**

For some reason, the prosecutor began to comment on the possible criminal liability of the Hyundai driver.  After it overruled the defense objection, the court again admonished the jury not to accept at face value the evaluation of the evidence in the attorneys' arguments.  The prosecutor acknowledged the court's lengthy experience and reiterated that closing arguments are based on 'what we believe the evidence has shown."

At the next recess, defense counsel argued that this was another prejudicial injection of the prosecutor's personal belief.  The court again rejected the claim.

As with the similar contention above, it is arguable whether this in fact could be interpreted as a communication of personal belief in the sufficiency of the evidence to establish a robbery and murder.  However, the court's iterated admonishment cured any possible misconduct.

**G**

The prosecutor, again seeking to denigrate the testimony of the bystander witness and the convertible driver, returned to arguing that these were the product of suggestive questioning on the part of the defense investigator.  Referring to the absence of any tape of the bystander interview or report on the nature of materials the investigator may have presented to the witness, the prosecutor argued, "You know the old saying, there was something rotten in Denmark, and that is rotten."  The court overruled the objections of defense counsel.

After the conclusion of argument, the court returned to the nature of the defense objections.  Defense counsel asserted this was an improper effort to impugn his investigator's integrity that was based on questioning the court had earlier stricken from the record.  The court responded that it was proper argument on the quality of the investigator's efforts.

We agree with the trial court that the prosecutor could property comment on the failure of the defense investigator to keep any records of his interview with a crucial witness, and the possibility that this unrecorded questioning conceivably could have colored

/////

16

1    the bystander's recollection.  He could also argue this was
     culpable.  This consequently was not misconduct.
2

3   People v. Wright, slip op. at 14-21.

4          This federal court sitting in habeas corpus applies to petitioner's prosecutorial

    misconduct claim the narrow standard of review under the federal due process clause
5

6          "and not the broad exercise of supervisory power." Donnelly v.
           DeChristoforo, 416 U.S. 637, 642, 94 S.Ct. 1868, 40 L.Ed.2d 431
7          (1974). A defendant's due process rights are violated if
           prosecutorial misconduct renders a trial "fundamentally unfair."
8          Darden v. Wainwright, 477 U.S. 168, 183, 106 S.Ct. 2464, 91
           L.Ed.2d 144 (1986). Courts in federal habeas cases review claims
9          of prosecutorial misconduct "to determine whether the prosecutor's
           remarks 'so infected the trial with unfairness as to make the
10         resulting conviction a denial of due process.' " Hall v. Whitley,
           935 F.2d 164, 165 (9th Cir.1991) (quoting Donnelly, 416 U.S. at
11         643, 94 S.Ct. 1868). That standard allows a federal court to grant
           relief when the state-court trial was fundamentally unfair but
12         avoids interfering in state-court proceedings when errors fall short
           of constitutional magnitude.

13  Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000).  In reviewing a claim of prosecutorial

14  misconduct, the court examines the challenge conduct to determine "whether, considered in the

15  context of the entire trial, that conduct appears likely to have affected the jury's discharge of its

16  duty to judge the evidence fairly."  United States v. Simtob, 901 F.2d 799, 806 (9th Cir. 1990).

17  Depending on the case, a prompt and effective admonishment of counsel or curative instruction

18  from the trial judge may effectively "neutralize the damage" from a prosecutor's error.  U.S. v.

19  Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1993) (citing Simtob, 901 F.2d at  806).

20         The court has reviewed the record of the entire trial in this matter, including the

21  closing arguments challenged by this claim.  Upon completion of said review, this court finds

22  that the state court's rejection of petitioner's prosecutorial misconduct claim was neither contrary

23  to nor an unreasonable application of controlling principles of federal law.  Accordingly, this

24  claim should be denied.

25  /////

26  /////

17

C.  Ineffective Assistance of Counsel

Petitioner's fifth claim is that he received constitutionally ineffective assistance of counsel when his trial attorney petitioner claims that he received constitutionally ineffective assistance of counsel when his trial attorney failed to request that the trial court admonish the jury prior to an eleven day recess that occurred during the middle of deliberations and failed to object to two instances of prosecutorial misconduct.[16]  Petitioner's sixth claim is that he received ineffective assistance of appellate counsel when his appellate counsel failed to raise on direct appeal claims that the trial court erred in failing to give sua sponte admonish the jury prior to the eleven day recess and the ineffective assistance of trial counsel claim raised herein.  These claims were raised in a petition for review to the California Supreme Court seeking review of an order by the state court of appeal summarily denying petitioner's motion to recall the remittitur.  See Item No. 5, lodged March 5, 2005.  The state supreme court denied the petition in an order that contained no statement of reasons for the decision.  See Item No. 6, lodged March 5, 2005.

The Sixth Amendment guarantees the effective assistance of counsel.  The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984).  First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. Strickland, 466 U.S. at 688.  To this end, petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment.  Id. at 690.  The federal court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance.  Id.  "We strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

---

[16]  Petitioner has withdrawn his ineffective assistance of counsel claims based on the failure to request an accomplice instruction with respect to the testimony of Raymond "Half-Pint" Rice.  See footnote 4, supra.

1    Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at

2    693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

3    unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

4    reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.;

5    see also Williams v. Taylor, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir.

6    2000).  A reviewing court "need not determine whether counsel's performance was deficient

7    before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . .

8    If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . .

9    . that course should be followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting

10   Strickland, 466 U.S. at 697).

11   The Strickland standards apply to appellate counsel as well as trial counsel.  Smith

12   v. Robbins, 528 U.S. 259, 285 (2000); Smith v. Murray, 477 U.S. 527, 535-36 (1986); Miller v.

13   Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).  In order to demonstrate prejudice in this context,

14   petitioner must demonstrate that, but for counsel's errors, he probably would have prevailed on

15   appeal.  Miller, 882 F.2d at 1434 n.9.

16   As noted above, petitioner claims that he received constitutionally ineffective

17   assistance of counsel when his trial attorney failed to request that the trial court admonish the jury

18   prior to an eleven day recess that occurred during the middle of deliberations and failed to object

19   to two instances of prosecutorial misconduct.  Petitioner's claim that his attorney was ineffective

20   in failing to challenge the two instances of prosecutorial misconduct, identified as ## 7 and 8 in

21   the first amended petition, is without merit.  See footnote 13, supra.  It should therefore be denied.

22   Petitioner also claims that his counsel was ineffective in failing to request

23   appropriate admonitions before the proceedings recessed for eleven days, a period that included

24   the Fourth of July holiday, after the jury had deliberated for two full days.  Petitioner

25   acknowledges that he has not shown any prejudice resulting from this alleged error, and the

26   /////

1   district court has denied his request to conduct discovery of the jurors.  See Order filed April 11,

2   2008.  Accordingly, this claim must be denied.

3          Petitioner also claims that his appellate counsel was ineffective in failing to raise a

4   claim on direct appeal that the trial court erred in failing to admonish the jury prior to the eleven

5   day recess, and in failing to raise the ineffective assistance of trial counsel claim raised herein.

6   For the reasons set forth in this section, petitioner has not shown a reasonable probability that the

7   outcome of his appeal would have been different had these claims been raised.

8          For all of the foregoing reasons, the state court's rejection of petitioner's claims of

9   ineffective assistance of trial and appellate counsel was neither contrary to nor an unreasonable

10  application of controlling principles of federal law.  Petitioner's fifth and sixth claims for relief

11  should be denied.

12         For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that

13  petitioner's application for a writ of habeas corpus be denied.

14         These findings and recommendations are submitted to the United States District

15  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

16  days after being served with these findings and recommendations, any party may file written

17  objections with the court and serve a copy on all parties.  Such a document should be captioned

18  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

19  objections shall be filed and served within fourteen days after service of the objections.  The

20  parties are advised that failure to file objections within the specified time may waive the right to

21  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

22  DATED: July 1, 2010.

23

24                                    UNITED STATES MAGISTRATE JUDGE

25

26  12;muha1856.157